# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-01670-COA

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF DOROTHY COLE PHELPS, DECEASED: IRENE PHELPS TERRY AND MARY ELLEN VICK PHELPS DOMIN | APPELLANTS/CROSS-APPELLEES |

v.

| | |
|---|---|
| HENRY VICK PHELPS, III, EXECUTOR OF THE ESTATE OF DOROTHY COLE PHELPS, DECEASED | APPELLEE/CROSS-APPELLANT |

| | |
|---|---|
| DATE OF JUDGMENT: | 09/06/2013 |
| TRIAL JUDGE: | HON. MARIE WILSON |
| COURT FROM WHICH APPEALED: | SHARKEY COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | WREN CARROLL WAY |
| ATTORNEY FOR APPELLEE: | P. SCOTT PHILLIPS |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| TRIAL COURT DISPOSITION: | FOUND WILL IS VALID AND SHOULD BE ADMITTED TO PROBATE |
| DISPOSITION: | AFFIRMED - 12/08/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., CARLTON AND FAIR, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1.   This appeal arises from the validity of Dorothy Cole Phelps's will.  Dorothy's three daughters, Helen Carolyn Phelps May ("Carolyn"), Irene Cole Phelps Terry ("Irene"), and Mary Ellen Vick Phelps Domin[1] ("Vicki") filed a petition to contest probate of Dorothy's will.  They claimed that Dorothy lacked testamentary capacity and was unduly influenced by

---

[1] The spelling Doman was used in the will.

her son, Henry Vick Phelps III ("Henry III"). The chancellor found that the will was valid and should be admitted to probate. From this, Irene and Vicki appeal arguing the chancellor erred in finding: (1) Dorothy had testamentary capacity and (2) Henry III presented clear and convincing evidence to rebut the presumption of undue influence. Henry III cross-appeals arguing the chancellor erred in: (1) excluding Frank Gardner Power's testimony and (2) denying his motion for a directed verdict. We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Henry V. Phelps II ("Henry II") and Dorothy had four children: Carolyn, Irene, Vicki, and Henry III.

¶3. On June 14, 1975, Dorothy executed a holographic codicil appointing Henry III as administrator and giving him ownership of their property should she and Henry II die at the same time.

¶4. On January 28, 1977, Henry II and Dorothy executed joint wills. Each spouse's will devised and bequeathed his/her property to the other spouse, with Carolyn, Irene, Vicki, and Henry III each receiving $100.

¶5. On April 10, 1979, Dorothy executed a holographic codicil leaving Henry III all personal and real property should she and Henry II die at the same time. This writing specifically notes that Dorothy's daughters had previously received land.

¶6. On July 23, 1987, Henry II and Dorothy executed a codicil to their 1977 wills, which provided that should they die at the same time, their entire estate would go to Henry III, with the exception of Carolyn, Irene, and Vicki each receiving $25,000.

2

¶7.     On December 11, 1987, Henry II died.  Dorothy's devises and bequests in the 1977 will lapsed upon Henry II's death, and without a new will, the estate would be divided equally between Carolyn, Irene, Vicki, and Henry III upon Dorothy's death.  All previous codicils would have no effect since Henry II and Dorothy did not die at the same time.

¶8.     After Henry II's death, Dorothy fell into a state of depression and was hospitalized until around December 15, 1987.  On January 13, 1988, Dorothy was hospitalized again due to a kidney problem and remained hospitalized until January 21, 1988.

¶9.     On February 10, 1988, Henry III drove Dorothy from Nitta Yuma, Mississippi, to Hollandale, Mississippi, so she could "tend to some business."  Dorothy met with an attorney, Mike Cordell, and executed the will that is the subject of this appeal.[2]  Henry III was not present during the will's execution.  The will was then placed in a safety deposit box in both Dorothy and Henry III's names.

¶10.    This will specifically revoked Dorothy's 1977 will and left to Carolyn, Irene, and Vicki a life estate in 320 acres of land, with the right to the income from the land during their lives, and a remainder interest in Henry III.  The residue of Dorothy's property was left to Henry III, and Henry III was appointed executor of Dorothy's estate.

¶11.    On June 17, 2011, Dorothy died.  Subsequently, Henry III filed a petition for probate of Dorothy's will in the Sharkey County Chancery Court.  Prior to the will being admitted to probate, Carolyn, Irene, and Vicki challenged the will on the grounds that Dorothy lacked

---

[2] Dorothy also filed a petition to probate Henry II's 1977 will. On March 1, 1988, Dorothy was appointed executor of Henry II's estate, and probate was completed on February 8, 1996.

testamentary capacity, and the will was the product of Henry III's undue influence. Carolyn later dismissed her contest.

¶12. After a trial, the chancellor found that there was a confidential relationship between Henry III and Dorothy, that there was an abuse of the confidential relationship, but that Henry III had rebutted the presumption of undue influence by clear and convincing evidence. Thus, in an amended final judgment, the chancellor found that Dorothy had testamentary capacity to execute the will on February 10, 1988, and the will was not the product of undue influence. Irene and Vicki appeal.

## DISCUSSION

### I. The Will

¶13. "When reviewing a chancellor's legal findings, particularly involving the interpretation or construction of a will, this Court will apply a de novo standard of review." *In re Estate of Mace*, 125 So. 3d 675, 678 (¶8) (Miss. Ct. App. 2013) (quoting *In re Last Will & Testament of Carney*, 758 So. 2d 1017, 1019 (¶8) (Miss. 2000)). "With respect to a chancellor's findings of fact in a will contest, [this Court] 'will not disturb the findings of a chancellor unless the chancellor was manifestly wrong or clearly erroneous, or the chancellor applied an erroneous legal standard.'" *Id.* (quoting *Goode v. Village of Woodgreen Homeowners Ass'n*, 662 So. 2d 1064, 1070-71 (Miss. 1995)).

#### A. Testamentary Capacity

¶14. In their first issue, Irene and Vicki claim the chancellor erred in finding that Dorothy possessed testamentary capacity.

4

¶15. "For a will to be valid, the testator must possess testamentary capacity." *Noblin v. Burgess*, 54 So. 3d 282, 291 (¶32) (Miss. Ct. App. 2010). "For testamentary capacity to be present, the testator must be of 'sound and disposing mind' at the time of the will's execution." *Id.* (quoting Miss. Code Ann. § 91-5-1 (Rev. 2004)). "At that time, the testator must: 'understand and appreciate the nature and effect of his act of making a will, the natural objects or persons to receive his bounty and their relation to him, and be able to determine what disposition he desires to make of his property.'" *Id.* (quoting *In re Estate of Mask*, 703 So. 2d 852, 856 (¶17) (Miss. 1997)).

¶16. Our supreme court has explained the burden of proof on the issue of testamentary capacity is as follows:

> At trial, the will's proponents carry the burden of proof, which they meet by the offering and receipt into evidence of the will and the record of probate. A prima facie case is made by the proponent solely by this proof. Afterwards, although the burden of proof remains on the proponents, the burden of going forward with proof of testamentary incapacity shifts to the contestants, who must overcome the prima facie case. The proponents may then present rebuttal proof if necessary. In short, the proponents must prove the testator's testamentary capacity by a preponderance of the evidence.

*In re Estate of Rutland*, 24 So. 3d 347, 351 (¶10) (Miss. Ct. App. 2009) (quoting *In re Estate of Edwards*, 520 So. 2d 1370, 1372 (Miss. 1988)).

¶17. In the instant case, an objection to probate was entered prior to the will being admitted to probate.

¶18. Henry III made his prima facie case of the will's validity through the testimony of Kay Ousley Hyer, Cordell's legal secretary at the time Dorothy's will was executed. Although Hyer had no recollection of the events on February 10, 1988, Hyer testified that she would

5

not have signed the will's attestation clause if she felt, through her interactions with Dorothy on February 10, 1988, that Dorothy was not of sound and disposing mind and memory. When asked whether Cordell would have signed the attestation clause, Hyer stated: "He would not have affixed his signature if [Dorothy was] not of sound mind and body."

¶19. To support their argument on this issue, both Irene and Vicki testified that Dorothy lacked testamentary capacity because of her grief over Henry II's death and because of other medical issues.

¶20. However, "[t]he mere fact that someone is too ill to handle his affairs does not in and of itself render him . . . void of testamentary capacity." *In re Estate of Laughter*, 23 So. 3d 1055, 1061 (¶22) (Miss. 2009). Furthermore, we recognize that "[t]he testimony of subscribing witnesses receives greater weight than the testimony of witnesses who were not present at the will's execution." *In re Estate of McQueen*, 918 So. 2d 864, 871 (¶30) (Miss. Ct. App. 2005) (citing *Edwards*, 520 So. 2d at 1373). Therefore, Hyer's testimony is given more weight than the testimony of Irene and Vicki, who were not present at the will's execution, did not interact with Dorothy on February 10, 1988, and have an interest in the outcome of this case.

¶21. Even if Irene and Vicki presented sufficient evidence to overcome Henry III's prima facie case, we note that Henry III presented rebuttal evidence through the testimony of Flora Collins. Collins worked for Dorothy for approximately twenty-six years and interacted with Dorothy on an almost daily basis. Collins stated that Dorothy appeared to be herself, "like she's always been," after returning home from the hospital. Collins also stated that Dorothy

told her about the will on two separate occasions: "She told me that I have a will and they're going to be surprised who I'm going to leave everything to." Additionally, we note that the will appears reflective of Dorothy's intent in prior codicils. This issue is without merit.

### B. Undue Influence

¶22. In their second issue, Irene and Vicki claim Henry III did not present sufficient evidence to overcome the presumption of undue influence.

### 1. Presumption of Undue Influence

¶23. A presumption of undue influence arises where: (1) a confidential relationship existed between the testator and a beneficiary, and (2) there existed suspicious circumstances—such as the testator's mental infirmity—or the beneficiary in the confidential relationship was actively involved in some way with preparing or executing the will. *In re Last Will & Testament of Bowling,* 155 So. 3d 907, 910-11 (¶16) (Miss. Ct. App. 2014) (citing *Croft v. Alder*, 237 Miss. 713, 115 So. 2d 683, 688 (1959)).

¶24. It is conceded that there was a confidential relationship between Dorothy and Henry III. However, the fact, alone, that a confidential relationship existed between Henry III and Dorothy is not sufficient to give rise to the presumption of undue influence. *See In re Estate of Grantham*, 609 So. 2d 1220, 1224 (Miss. 1992).

¶25. Nevertheless, in *In re Estate of Harris*, 539 So. 2d 1040 (Miss. 1989), our supreme court held that the presumption was raised with very little besides a confidential relationship. *In re Last Will & Testament of Smith*, 722 So. 2d 606, 612 (¶18) (Miss. 1998). In *Harris*, "the beneficiary simply found an attorney at the testator's request and drove the testator to

7

the attorney's office." *Id.*

¶26.    The facts in the instant case are distinguishable from those in *Harris*. Henry III did not contact the attorney prior to the execution of the will. Nor did Henry III have knowledge that he was driving Dorothy to Hollandale for the purpose of executing a will. Henry III merely drove Dorothy to Hollandale on February 10, 1988, so she could "tend to some business."

¶27.    Furthermore, Henry III was not present during the execution of the will. Hyer testified as to Cordell's usual practice with respect to allowing other people in the room during the execution of a will. Hyer stated: "I cannot recall a time that he would do that. It was always just the individual . . . It would be just between [Cordell and] that individual."

¶28.    In finding a presumption of undue influence, the chancellor noted Dorothy's health and age. The chancellor also noted that after the will's execution, the will was placed in a safety deposit box in both Dorothy and Henry III's names; therefore, Henry III had the opportunity to view the will after its execution. The circumstances listed by the chancellor had nothing to do with the preparation and execution of the will or with Dorothy's independent action.

¶29.    The fact, alone, that a confidential relationship existed between Henry III and Dorothy is not sufficient to give rise to the presumption of undue influence. *See Grantham*, 609 So. 2d at 1224. Henry III was not actively involved in preparing or executing the will, nor were there suspicious circumstances that negate independent action. *See Dean v. Kavanaugh*, 920 So. 2d 528, 537 (¶46) (Miss. Ct. App. 2006). As such, the chancellor erred in finding that

there was a presumption of undue influence.  However, because we ultimately reach the same conclusion, this issue is without merit.

### 2.    Overcoming the Presumption of Undue Influence

¶30.    Even if there was a presumption of undue influence, Henry III presented sufficient evidence to overcome such a presumption.

¶31.    Our supreme court has stated that:

> [T]he presumption of undue influence is overcome if the beneficiary has proven by clear and convincing evidence:
>
> (1) Good faith on the part of the beneficiary;
>
> (2) the testator's full knowledge and deliberation of his actions and their consequences; and
>
> (3) independent consent and action on the part of the testator.

*Grantham*, 609 So. 2d at 1224 (citing *Mullins v. Ratcliff*, 515 So. 2d 1183 (Miss. 1987)).

¶32.    In the instant case, the record contains sufficient evidence to satisfy each of these three prongs.  With respect to the good-faith requirement, the chancellor considered the following factors:  (a) the identity of the initiating party seeking preparation of the will; (b) the place of the execution of the will and in whose presence; (c) the fee paid; (d) by whom it was paid; and (e) the secrecy or openness surrounding the execution of the will.  *In re Estate of Holmes*, 961 So. 2d 674, 682 (¶25) (Miss. 2007).  The chancellor found that Dorothy initiated the preparation of the will, the terms of the will were discussed between Dorothy and Cordell outside the presence of others, and the will was executed before two

9

attesting witnesses.[3] Although there was no evidence of the fee paid or who paid the fee, we agree there was clear and convincing evidence that Henry III acted in good faith.

¶33. With respect to the second requirement—that Dorothy had full knowledge and deliberation of the consequences of her actions—the chancellor considered the following factors: (a) whether Dorothy was aware of her total assets and their worth; (b) whether Dorothy understood who her natural inheritors were and how her action would legally affect prior wills; (c) whether Dorothy knew nonrelative beneficiaries would be included or excluded; and (d) whether Dorothy knew who controlled her finances and how dependent Dorothy was on anyone handling her finances. *Holmes*, 961 So. 2d at 684 (¶39). The chancellor found that the will gave each daughter not only a life estate in 320 acres of land but also exclusive control and possession of the income generated by that land, which was evidence that Dorothy was aware of her total assets. The chancellor also found that the revocation clause along with specific devises and bequests in the will was evidence that Dorothy understood who her natural inheritors were and how her action would legally affect prior wills. It is clear from prior documents that Dorothy never had any intention of including nonrelative beneficiaries. Finally, the chancellor found that there was evidence that Dorothy knew who controlled her finances. We agree there was clear and convincing evidence that Dorothy had full knowledge and deliberation of the consequences of her actions.

¶34. With respect to the last requirement, the chancellor found that Dorothy exhibited

---

[3] *See Rogers v. Pleasant*, 729 So. 2d 192, 194 (¶9) (Miss. 1998).

independent consent and action when she obtained independent advice from Cordell, who was a competent person, disconnected from Henry III, and devoted wholly to Dorothy's interests. *Holmes*, 961 So. 2d at 680 (¶18). We agree there was clear and convincing evidence that Dorothy exhibited independent consent and action.

¶35. Assuming there was a presumption of undue influence, the presumption was overcome by clear and convincing evidence that Henry III acted in good faith, Dorothy had full knowledge and deliberation of the consequences of her actions, and Dorothy exhibited independent consent and action when she executed her will. This issue is without merit.

## II. Cross-Appeal

¶36. Henry III cross-appeals arguing the chancellor erred in: (1) excluding Power's testimony and (2) denying his motion for a directed verdict. However, because we affirm, these issues do not need to be addressed.

¶37. **THE JUDGMENT OF THE CHANCERY COURT OF SHARKEY COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL, FAIR AND WILSON, JJ., CONCUR. JAMES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

11